UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MUSTANG TOWERS COUNCIL OF CO-OWNERS, INC. | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 2:18-CV-00355 |
| UNITED NATIONAL INSURANCE COMPANY | § § § | |
| Defendants. | § § § | |

## EXHIBIT B: AFFIDAVIT OF WILLIAM J. CHRISS

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF NUECES | § |

BEFORE ME, the undersigned notary public, on this day personally appeared William J. Chriss, known to me to be the person whose name is subscribed to this instrument, and being first duly sworn, such person deposed and stated the following:

"My name is William J. Chriss. I am over 18 years of age and I am fully competent to make this Affidavit. I have personal knowledge of the facts stated herein because I have received emails and correspondence from opposing counsel in this case.

Attached to this affidavit is the attorney Employment Contract under which I and my firm are employed in this case. Also attached are the letter I received from opposing counsel in response to our pre-suit demand letter, as well as an engineer's report provided me by email from his office thereafter."
.''

Further affiant sayeth not.

_____
William J. Chriss

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned notary public, on this the ___ day of _____, 2019.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

TERRY A. THOMAS
My Notary ID # 6828711
Expires July 24, 2021

2

# EMPLOYMENT CONTRACT

**I.**     **The Matter:**

The condominium owners' association for Mustang Towers Condominiums in Port Aransas, Texas, commonly known by the name "Mustang Towers Council of Co-Owners, Inc." and hereinafter referred to as the "Client," by and through its authorized agent and officer undersigned, hereby employs WILLIAM J. CHRISS, P.C. and the firm to which it is of counsel, THE SNAPKA LAW FIRM, as well as lawyers MICHAEL G. MORRIS and FRED D. DREILING (collectively "Attorneys") to represent Client (1) in all claims and causes of action arising out of, or relating to, damage to the Mustang Towers Condominiums in Nueces County, Texas from Hurricane Harvey, including Client's resulting insurance claims (whether or not for the use and benefit of others, such as unit owners in their shares of ownership in common elements or limited common elements); and (2) in all claims and causes of action for faulty, negligent, inadequate, illegal, improper, or otherwise wrongful claims adjustment, claims investigation, claims handling, repairs, remediation, or attempted repairs regarding any such hurricane damage by any person or entity (hereinafter collectively referred to as the "Matter"). The Matter and the associated representation expressly do not include tax advice and no representation is hereby made or has been made as to the tax consequences of any aspect of the Matter or any recovery or settlement involving any portion of it. Client should consult a certified public accountant or tax attorney regarding possible tax consequences of any aspect of the Matter.

It is understood that this contract means that Attorneys represent only the condominium owners' association for the Mustang Towers Condominiums in Port Aransas, Texas in all such capacities, and will not represent individual unit owners. This contract does not create an Attorney client relationship between Attorneys and any individual or entity other than the condominium owners' association (the "Client").

1

**II. Attorneys' Fee**

In consideration of such services, the Client hereby agrees to pay WILLIAM J. CHRISS, P.C., and THE SNAPKA LAW FIRM, MICHAEL G. MORRIS and FRED D. DREILING jointly as a reasonable contingent fee for Attorneys' services pursuant to this employment contract the following amounts calculated as a percentage of any monies, interest, property, or anything else of value received by client in connection with any of the Client's claims and causes of action (in whatever capacity) connected with the Matter:

(A)     ten percent (10%) of all monies, interest, property, or value received by or on behalf of client from anyone within 61 days of the first written demand for payment sent by any of the Attorneys to any of Client's insurers;

(B)     twenty percent (20%) of all monies, interest, property, or value received by or on behalf of Client from anyone less than 60 days after the end of the period described in subparagraph II A) above;

(C)     thirty percent (30%) of all monies, interest, property, or value received by or on behalf of Client from anyone less than 60 days after the end of the period described in subparagraph II. B) above; and

(D)     forty percent (40%) of all monies, interest, property, or value received by or on behalf of Client after the end of the period described in sub-paragraph II. C) above.

Client hereby agrees to pay from any such settlement or recovery (before deduction of expenses under paragraph III below), Attorney's fees in such amount, or the maximum contingent fee allowed by law, whichever is less.

The recovery or settlement to which the percentage of Attorneys' contingent Attorneys' fee is to apply and upon which such fees are to be calculated as and when reflected above

includes all monies and everything else of value recovered, received, or obtained in connection with the Matter after Attorneys are retained by this Employment Contract without regard for, or deduction for, any expenses of the case or other expenses, mortgages, liens, subrogation interests, or other encumbrances on Client's claims, recovery, or property, except that no fee will be charged or owed on the advance of approximately $700,000 currently pending and recently approved by TWIA if such advance is received by Client within 60 days of this agreement; If it is NOT received by Client within 60 days of this agreement, fees will be calculated and charged on any such advance as reflected in subparagraphs (A) through (D) above.

Client also understands that it may be offered a settlement that involves a benefit other than a single lump sum cash payment. If Client chooses to make any such settlement of all or part of the claims, then all expenses and other items to be deducted from any settlement of the Matter, including Attorney's fees, must be paid lump sum in cash at settlement. It is agreed that the amount of the contingent fee in such case shall be calculated as hereinbefore agreed, with the agreed percentage to be calculated upon the total present cash value to Client of any benefit recovered or received, including any reimbursement by any defendant or other party of Attorneys' fees. Such present value shall be determined as of the date of the settlement by a reputable structured settlement consultant or licensed appraiser or other competent expert chosen by Attorneys.

It is understood that it is also likely that claims will be made on behalf of Client against an insurance company or its agents and affiliated companies ("insurance defendants') and/or other defendants to reimburse Client for its Attorney's fees. The outcome of any such claims for Attorney's fees will not affect Client's obligation to pay Attorneys the amount of money that is owed under this contract. Any contingent fee owed to Attorneys will be calculated based upon total recovery, including any Attorney's fees recovered, whether awarded to Client in Court or

3

not.

All sums due and to become due are to be paid at the offices of Attorneys in Corpus Christi, Nueces County, Texas.

### III. Expenses of the Case

Attorneys will have the sole authority to decide on the case and litigation expenses to be incurred in pursuing this Matter, including the claims and potential litigation, and The Snapka Law Firm will advance such expenses for Client's account. Client will only be liable to repay such case and litigation expenses out of any recovery in the Matter after deduction and payment of Attorneys' fees, and only to the extent of such net recovery. If there is no settlement or recovery Client will be under no obligation to repay any case or litigation expenses incurred by Attorneys in connection with this Matter.

Any preparation, investigation, and trial expenses advanced or paid by Attorneys and unpaid by the Client at the time of any settlement of the case shall be deducted from the net recovery of Client after calculation and deduction of Attorney's fees.

By way of illustration and not limitation, the expenses Client agrees to pay include: (1) "office expenses directly attributable to Attorneys' representation"; however, the term "office expenses" does not include Attorneys' general overhead expenses; for example, Attorneys' office rent, computer law library or payroll expense. Instead, the "office expenses directly attributable to Attorneys' representation" includes internal document copying/reproduction of material/documents related to the Matter; mileage, airfare, travel, hotel/motel expense incurred as a result of Attorneys' representation of client; long distance telephone charges; facsimile and postage expense attributable to the Matter; (2) charges by "third party vendors" and expert witnesses; (3) charges by LEXIS, Westlaw and other internet sites for legal, party, investigative

4

and business research directly attributable to Attorneys' representation; (4) court costs; (5) charges by the involved court clerk(s); (6) charges for "e-filing" of court documents; (7) expenses attributable to fact witnesses; (8) charges by testifying and/or consulting expert witnesses; (9) interpreter fees; (10) investigator's fees; (11) charges for oral and written depositions; (12) charges by court reporter/court reporting firms; (13) charges by process servers; (14) charges for subpoenas; (15) charges by video technicians; (16) charges of third party vendors for image, video, material and document copying/reproduction; (17) charges by third party vendors for providing trial presentation technical services; and (18) any cost, expense, fee and charge, directly attributable to Attorney's representation of client in this Matter.

**IV. Other Attorneys**

Client also authorizes Attorneys to hire such other Attorneys or legal experts, as they may deem advisable. All additional legal counsel hired by "Attorneys" to act as Attorneys practicing law in assisting in representation of the Client in this Matter are to be paid out of the contingent Attorneys' fees agreed to herein, and the association, if any, of such additional Attorneys shall not increase the amount, or the percentage, of the contingent Attorneys' fee Client is obligated to pay Attorneys hereunder.

However, fees of other experts, including expert witnesses who may be licensed Attorneys (for example expert witnesses on attorney fee issues, or expert witnesses on insurance claims handling practices/procedures) are to be advanced by The Snapka Law Firm, and repaid by Client out of its net recovery as preparation, expert, investigation, or trial expenses as described above.

If Attorneys hire other **legal counsel** (as opposed to consulting or testifying expert witnesses who happen to be licensed Attorneys), this will involve their sharing the fees hereby

5

granted with such other lawyer or lawyers at no additional cost to Client. Attorneys' hiring of any other such **legal counsel** shall not become effective, unless and until Client, in its discretion consents in writing to the terms of the hiring after being advised of (1) the identity of the lawyer or law firm involved, (2) whether the fees will be divided based on the proportion of services rendered or by lawyers agreeing to assume joint responsibility for the representation, and (3) the share of the fee that each lawyer or law firm will receive or, if the division is based on the proportion of services performed, the basis on which the division will be made.

It is understood and agreed that prior to execution of this employment contract Michael Morris and Fred Dreiling have represented Client in connection with various legal issues, condominium issues, transactional issues and similar matters on an hourly rate attorneys' fee basis. Further, it is contemplated that Client may continue to request that Michael Morris and Fred Dreiling provide Client legal services that do not fall within the scope of this employment contract and the Matter. This employment contract does not change, amend or supersede such other employment arrangement or agreement between Client and Michael Morris and/or Fred Dreiling. Representation of Client on all other matters, whether by Michael Morris or Fred Dreiling or others, is not within the scope of the Matter, or this employment contract.

With respect to this Matter only, it is understood and agreed that Attorneys will work jointly on the Matter and that Client has been advised in writing prior to the execution of this employment contract that Attorneys will split the contingent Attorneys' fees in the Matter as follows:

(1)     The identity of the lawyers or law firms who will participate in sharing the fee under this employment contract are: (a) WILLIAM J. CHRISS, P.C., (b) the firm to which he is of counsel, Kathryn Snapka d/b/a THE SNAPKA LAW FIRM,

(c) FRED DREILING, who is of counsel to Ostarch Hilmy McCauley, and (d) MICHAEL MORRIS, who is also of counsel to Ostarch Hilmy McCauley ;

(2)      the fees will be divided based on the lawyers agreeing to assume joint responsibility for the representation of Client in this Matter, and

(3)      the share of the fee that each lawyer or law firm will receive is: 15% of any contingent fee for Fred Dreiling; 15% of any contingent fee for Michael Morris; 38.5% of any contingent fee for William J. Chriss, P.C.; and the remaining 31.5% for Kathryn Snapka, d/b/a, The Snapka Law Firm.

Dreiling and Morris will share pro rata the cost of "Attorneys" hiring any additional counsel, but Dreiling and Morris will have no obligation to advance the case or litigation expenses referenced herein. Dreiling and Morris will assist in maintaining Client contact, Client communications, and with general litigation support as requested by the remaining Attorneys.

This division or allocation of fees is based on all Attorneys agreeing to assume joint responsibility for the representation of Client in this Matter, and such retention and division of fees shall become effective only upon written consent of the Client by signing this agreement.

**V.      Approval Necessary for Settlement:**

Attorneys shall not offer or accept a settlement without Client's full consent. Simply put, Attorneys will not settle or resolve any claims arising out of the Matter without first having obtained the full consent of the Client.

**VI.      No Payment of Judgment:**

Client recognizes and agrees that Attorneys are not responsible for payment of any monetary judgments, including Attorneys' fees, that any other party may recover by way of any counterclaims or cross-claims, or other claims for relief or damages against Client.

**VII.    No Guarantee of Outcome:**

Litigation is unpredictable. Attorneys do not and cannot warrant or guarantee the outcome of the claims contemplated in this employment contract. Client agrees that Attorneys have not made any representation of outcome in this Matter, or as to the size or amount of any claims involved or the likelihood of their success, or the length of time that may be required.

**VIII.    Other Provisions**

This contract and employment is binding upon Client, its heirs, successors, representatives and/or assigns, and those for whom it is empowered to act by its bylaws and other organizational documents. Prior to signing this contract, Attorneys advised Client of the contents of the Texas Lawyer's Creed by providing the url where it may be read at: https://www.legalethicstexas.com/Downloads/Texas-Lawyers-Creed/Texas_Lawyers_Creed.aspx, and Attorneys have also advised Client that in performing this representation they are guided by the precepts of such Creed.

Client understands that there may be mortgages, liens or subrogation interests on any claims it has that would require it to pay or reimburse a third-party those benefits it has already been paid once for this loss, or which would require Client to pay other bills or outstanding charges or which could require payment to a mortgage company out of any settlement or recovery in this case. Client agrees that Attorneys may withhold from any recovery, out of Client's net share after Attorney's fees any money required to satisfy such liens or subrogation interests, if any.

Client hereby authorizes Attorneys to make use of publicly available information acquired in this representation, not privileged by law, including the fact Attorneys represent client or have represented Client, in order to avoid conflicts of interest or comply with other law or court order.

Client authorizes Ms. Ginger Smith, its president, or any successor president, and CCMS,

8

Inc. to communicate with Attorneys on this Matter as "authorized representatives of the client" (as that term is defined and used in Rule 503 of the Texas Rules of Evidence) although such officer and representative is not made a client of Attorneys under this agreement and Attorneys' sole duty under this agreement is to Client. Client agrees that Attorneys may rely upon the decisions and instructions communicated to them by Ms. Ginger Smith as representing the will and desires of Client. Client may designate additional client representatives for communication purposes as it deems necessary. And Client agrees to inform Attorneys promptly if the identity of any decision-maker or "authorized representative of the client" changes or is replaced by Client and to provide appropriate documentation of same.

Client understands that at the conclusion of Attorneys' handling of this Matter, the file material generated by them on this Matter in Client's behalf is Client's property. Client agrees that such file may be maintained by Attorneys in either paper or digital format, as they so choose, and that it is Client's responsibility to obtain its file from Attorneys at the conclusion of this Matter by letting them know it wants it. Client will instruct Attorneys at the conclusion of the Matter how it will undertake handling and storage of the original file and where to deliver it. Attorneys may keep a copy of any portion of the file if they choose, but absent such instruction from Client within six months of the conclusion of Attorneys' representation in the Matter, Client agrees that Attorneys may destroy the original file or any portion or copy thereof in order to avoid storage costs.

Attorneys may withdraw from representation in the event that: (a) Client requests that Attorneys pursue a course of conduct that is unethical, illegal or prohibited under the disciplinary rules governing the Attorneys and the attorney/client relationship; (b) Client breaches this

9

agreement; or (c) such withdrawal is authorized or required by relevant disciplinary rule or other law.

If Attorneys withdraw for or because of any of the matters specified in sub paragraphs (a) through (c) above, or if Client terminates this employment contract without proper legal justification, then Attorneys shall be entitled to such reasonable fee as is allowed by the opinions, rules, factors and guidelines approved by the appellate courts of the State of Texas, or as set out in the Texas Disciplinary Rules of Professional Conduct.

Client affirms that this employment contract was not improperly solicited by Attorneys; that this employment contract is not being entered into as a result of promises of money; and that no promises of a successful recovery or a successful outcome have been made by Attorneys.

This employment contract will be construed under the laws of Texas, and all obligations of the parties created hereunder are performable in Nueces County, Texas.

In case any one or more of the provisions contained in this employment contract shall be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions thereof, and this employment contract shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

This employment contract constitutes the sole and only agreement by and between the parties and supersedes any prior understandings or written or oral agreements between the parties concerning the subject matter discussed herein.

SIGNED this ___12th___ day of ___April___, 2018.

Mustang Towers Council of Co-Owners, Inc. ("Client")

By: _____, President

Address:  6109 Hwy. 361, Port Aransas, Texas 78373

Telephone #s:

(work#)  361-749-6212

(home#)  512-565-7674

(fax#):  361-749-6260

Email:  gingersmithmt702@gmail.com

WILLIAM J. CHRISS, P.C.
Of counsel
And KATHRYN SNAPKA
The Snapka Law Firm
606 N. Carancahua, Suite 1511
Corpus Christi, Texas 78401
Telephone No. (361) 888-7676
Email:  wjchrisspc@gmail.com

WILLIAM J. CHRISS
State Bar No. 04222100

KATHRYN SNAPKA
State Bar No. 18781200

FRED D. DREILING
SBN 06115100
MICHAEL G. MORRIS
SBN 14495500
Wells Fargo Tower
615 North Upper Broadway, Suite 800
Post Office Box 2888
Corpus Christi, Texas 78403
Telephone: (361) 884-1961, 802
Facsimile: (361) 889-5100
E-Mail: fdreiling@ohmlegal.net
E-Mail: mgmorris@ohmlegal.net

11

_____

Michael G. Morris


_____

Fred D. Dreiling



9601 McAllister Freeway  410, Suite 401, San Antonio, TX 78216
Tel: 210-569-8500    Fax: 210-569-8490
www.gcaklaw.com

Henry B. Gonzalez III
Steve Alfonso Chiscano
David S. Angulo
Richard J. Kasson

**Richard J. Kasson**
Direct Tel: 210-569-8487
rkasson@gcaklaw.com

August 31, 2018

***VIA FAX & EMAIL***

William J. Chriss
THE SNAPKA LAW FIRM
606 N. Carancahua Street, Suite 1511
Corpus Christi, Texas 78401

Re:   Chapter 542A.006 Written Notice of Insurer Election of Legal Responsibility with
      respect to United National Insurance Company's Claim # 17004145 regarding
      Mustang Towers Council of Owners, Inc. located at 6109 State Highway 361, Port
      Aransas, Texas 78373
      Our File No.:  18052.113

Dear Counsel:

Regarding the above-referenced matter, please be advised that our client, United National
Insurance Company ("UNIC"), is providing this written notice making an election of legal
responsibility pursuant to TEX. INS. CODE § 542A.006 with respect to the above-referenced claim
involving the property located at 6109 State Highway 361, Port Aransas, Texas 78373.

Accordingly, UNIC elects to accept whatever liability Brush Country Claims, Ltd. and/or
Robert Soefje may have with respect to their involvement with the above-referenced claim (17004145).

As always, should you have any questions or concerns regarding the above, please do not
hesitate to contact me.  With best regards, I remain,

Very truly yours,

*Richard J. Kasson*

Richard J. Kasson

RJK/rmm

# ⅢᎬⅠ MOODY ENGINEERING INC

Eric D. Moody, P.E., Ph.D.
Keith A. Moody, P.E., CFM
Justin F. Wagner, P.E.

9225 Bee Cave Road
Bldg. A, Suite 200
Austin, Texas 78733

Telephone: (512)502-8333
Toll Free: (800)821-9112
Fax: (512)502-8334
MOODYENGINEERING.COM

August 28th, 2018

Mr. Richard Kasson
Gonzalez Chiscano Angulo & Kasson, PC
9601 McAllister Freeway, Suite 401
San Antonio, Texas 78216

Re: Preliminary findings pertaining to forensic engineering investigation of damage and distress to 15 story condominium building; Insured: Mustang Towers; Claim No.: 1027766; Policy No.: 65884208; Property Address: 6109 Highway 361 in Port Aransas, Texas; Date of Loss: 8/25/2017; Our File No.: 18-207

Dear Mr. Kasson:

Per your request I performed a preliminary forensic engineering investigation of the observed damage and distress to the 15 story condominium building known as Mustang Towers and located at 6109 Highway 361 in Port Aransas, Texas. The objective of this forensic engineering investigation was to perform an independent engineering assessment and causation analysis of the observed damage and distress in the modified bitumen built-up roof, building envelope, and pre-stressed hollow core concrete panels. I also performed a limited inspection of the brick veneer and concrete masonry units (CMUs) used to support the hollow core concrete panels that frame the floor/ceiling of each story of the building. I also performed an inspection of the interior finishes of several condominium units.

This investigation involved both a site investigation and a review of available documentation pertaining to the loss. We also reviewed the available severe weather data from the National Weather Service (NWS) associated with the passing of Hurricane Harvey which made landfall during the evening hours of August 25th, 2017 near Rockport, Texas. This investigation was limited to a visual inspection of exposed surfaces of selected areas throughout the condominium building. No intrusive or destructive testing was performed as part of this limited forensic engineering investigation.

In performing my forensic engineering analysis of the observed distress in this condominium building I reviewed and took into consideration the following:

1. Notes, photographs, observations, and video collected during my site investigation of this condominium building performed on August 2nd, 2018.
2. Repair estimate and photographs provided by Loss Solutions dated November 27th, 2017.
3. Repair estimate and photographs provided by Eberl Claims Service dated March 6th, 2018.
4. Report from Tremco Inc. dated December 30th, 2017.
5. Report from LNV Engineering dated February 8th, 2018.
6. Report from LNV Engineering entitled "*Limited Structural Visual Condition Assessment*" dated April 17th, 2018.

Mr. Richard Kasson
Page 2 of 6

7. Report from LNV Engineering entitled "*Limited Structural Recommendations Pertaining to the Boardwalk*" dated November 14th, 2017.
8. Report from LNV Engineering entitled "*Roof Analysis Report*" dated January 18th, 2018.
9. Documents Bates Stamped PAIC00860 to PAIC001366.
10. Documents Bates Stamped PAIC003515 to PAIC004400.
11. Documents Bates Stamped SOEJFE003704 to SOEJFE003724.
12. Documents Bates Stamped SOEJFE004488 to SOEJFE004505.
13. National Weather Service (NWS) data associated with Hurricane Harvey which made landfall during the evening hours of August 25th, 2017.
14. Records from the Nueces County Appraisal District for 6109 Highway 361 in Port Aransas, Texas.
15. Miscellaneous correspondence.

Prior to inspecting this commercial building I reviewed the available severe weather data from the NWS associated with the arrival of Hurricane Harvey during the evening hours of August 25th, 2017. Hurricane Harvey made landfall near Rockport, Texas as a category 4 storm. At landfall the peak winds of Hurricane Harvey were reported to be in excess of 129 mph. In the area of the Mustang Tower Condominiums the peak 10-meter wind gusts were likely in the range of 120 to 140 mph. A copy of the NWS data is attached to this report.

The Mustang Towers condominium building was constructed in ≈ 1981 and consists of a 15 story masonry and concrete building with a total of 57 individual condominium units. The ground floor of the condominium building includes the manager's apartment, lobby, recreation room, and a meeting room. The condominium balconies located at the east side of the building provide a direct view of the coastline and Gulf of Mexico. A timber boardwalk provides access across the sand dunes to the beach area. An in-ground pool is located at the west side of the building.

The reinforced concrete foundation is reportedly supported by concrete pilings that extend to depths ranging from 40 to 60 feet below grade. The structural walls of the building consists of concrete masonry units (CMUs). Each floor of the condominium tower is constructed with pre-cast, pre-stressed hollow core concrete panels. These hollow core concrete panels form the floor/ceiling between each story of the condominium building. Masonry brick veneer is located at the north, south, and west faces of the building. Stairwells are located at the northwest and southwest corners of the building. An elevator shaft is centered along the west face of the building.

As part of my forensic engineering investigation of the observed distress in this condominium building I inspected the building on August 2nd, 2018. The site investigation included documenting and photographing observed distress in the modified bitumen roof covering, building envelope, pre-cast hollow core concrete panels, CMU walls, and the interiors of selected condominium units.

The brick veneer on the north, east, and west sides of the building appeared to be in overall good condition considering the age of the building and the harsh environmental conditions in this area (ref. photographs 1-7). There were some minor hairline mortar

Mr. Richard Kasson
Page 3 of 6

cracks in isolated areas of the brick veneer at the northeast corner of the building. This very minor distress did not appear to be storm related.

The modified bitumen (mod-bit) roof covering on this building was in a severely aged and deteriorated condition. The mod-bit roof was also poorly drained. There was ponding water located in several areas on the roof (ref. photographs 11, 25, and 32-33). This mod-bit roof had long ago reached the end of its useful service life and should have been replaced as part of the long-term maintenance of this condominium building. The cap sheet on this built-up roof had lost a significant portion of its granule surface (ref. photographs 16-23). Some areas of the mod-bit cap sheet had lost 90% of the protective granules (ref. photographs 20-21). Several seams in the mod-bit cap sheet exhibited evidence of prior repair (ref. photographs 24-25 and 28-29). Some adjoining seams of the base flashing had also been repaired with sealant on prior occasion (ref. photographs 26-27). Several of the repaired areas in the cap sheet are located in areas of ponding water (ref. photographs 32-33).

Inspection of the mod-bit roof on this building revealed one isolated gouge that could have resulted from wind blown debris (ref. photographs 22-23). According to information provided at the inspection the mod-bit roof on the building exhibited only minor damage immediately after the passing of Hurricane Harvey. As such, it was reported that an allowance was made for the repair of "*one square*" of the mod-bit roof, due to damage sustained by flying debris (ref. photographs 8-11 and 32-35).

The metal coping cap on the parapet walls was in an aged and rusted condition. The seams in the metal coping cap had been repaired with sealant on prior occasion (ref. photographs 36-37). The cabling and ballast used to support the cell phone infrastructure, located on the roof of the building, is shown in photographs 38-39.

Inspection of the concrete walkways, located on the north side of the building, indicated that the surface was inadequately sloped away from the building (ref. photograph 40). As such, rain water likely ponds against the brick veneer on each floor of the building. It was also apparent that this brick veneer had experienced water infiltration on prior occasion. Inspection of the brick veneer revealed that all of the weep holes had been sealed with either a coating and/or sealant material (ref. photographs 40-43). The weep holes had clearly been sealed in an attempt to eliminate water infiltration of the building envelope.

It was also readily apparent that the Mustang Tower condominium building had experienced a history of corrosion in both the concrete elements of the super structure as well as in the metal paneling on the elevator shaft (ref. photographs 44-46). Inspection of the balcony areas of selected condominium units revealed isolated spalls in the pre-cast hollow core concrete panels used to construct the building (ref. photographs 48-55 and 60-63). This includes isolated spalls at the connections between the railing and the hollow core panels (ref. photographs 49-51). Isolated areas showed severe corrosion in the exposed steel reinforcing cables in the hollow core concrete panels (ref. photographs 52-53 and 62-63). Inspection of the pre-cast hollow core concrete panels also revealed evidence of prior repair (ref. photographs 54 and 56-59). This is typical for a 30-40 year old, steel reinforced concrete structure, located in the harsh environmental conditions along the Gulf of Mexico. Other areas of the hollow core concrete panels exhibited evidence of ongoing spalling/cracking in the areas of the pre-stress cables (ref. photographs 54, 55, and 60-63).

Mr. Richard Kasson
Page 4 of 6

Inspection of this condominium building also revealed evidence of a long history of cracking and repair in the reinforced CMU walls supporting the hollow core concrete panels (ref. photographs 64-79). This cracking was most severe on the east side of the building, with direct exposure to the Gulf of Mexico. Many of the repaired cracks in the CMU walls exhibited evidence of additional distress (ref. photographs 64-67, 70, and 74). Other areas of distress in the building also exhibited evidence of prior repair (ref. photographs 66, 69, 71, 73, and 75). The ongoing cracking and related distress in the CMU walls is the result of long term exposure to the harsh coastal environment. The ongoing distress in the CMU walls is not related to Hurricane Harvey.

During my site investigation I inspected the interiors of several condominium units. The interior wall and ceiling surfaces of these condominiums were in varying stages of restoration subsequent to the water damage incurred during the passing of Hurricane Harvey. It was readily apparent that water had infiltrated the glass windows and doors located at the east balconies of many units within the Mustang Tower condominium building. Once in the interior of the building the water had percolated through the pre-cast hollow core concrete panels, damaging the interiors of the condominiums located at lower floors of the building. It was outside the scope of this report to address the observed damage and ongoing renovations on the interiors of these various condominium units.

Based upon my forensic engineering investigation and analysis of the noted distress in this condominium building I have reached the following preliminary findings and conclusions:

1.  The individual condominium units located in the Mustang Tower condominium building sustained varying degrees of damage primarily as a result of water infiltration through the elevator shaft, windows, and doors located at the north and east sides of the building during the passing of Hurricane Harvey. Once inside the building the storm water damaged wall and ceiling finishes throughout the condominium tower. The storm water then percolated down to lower levels within the building causing additional interior damage.

2.  The mod-bit built-up roof on this condominium building was in an aged and deteriorated condition. It was readily apparent that this mod-bit roof covering had long ago reached the end of its useful service life. As a result of the severe age related deterioration in this mod-bit roof it should have long-ago been replaced as part of the long-term maintenance of the building.

3.  The mod-bit built-up roof revealed clear evidence of a long history of prior repair. These prior repairs include sealant applications along seams in the mod-bit cap sheet and base flashing and at flashing around plumbing vents.

4.  The mod-bit built-up roof on this condominium building was reportedly damaged as a result of flying debris during the passing of Hurricane Harvey. The isolated damage caused by flying debris was repaired subsequent to the passing of Hurricane Harvey. These localized repair areas are shown in photographs 8-11 and 32-35. The high wind associated with Hurricane Harvey also reportedly damaged the roof on the elevator shaft.

5.  The metal coping cap on the parapet walls of the building was in an aged and rusted condition (ref. photographs 36-37). Sealant had been applied along the seams

Mr. Richard Kasson
Page 5 of 6

    between adjoining pieces of the metal coping cap. There was no evidence of damage to the metal coping cap resulting from the high winds associated with Hurricane Harvey.

6. The concrete walkway located at the west side of the building was inadequately sloped to promote drainage of blowing rain water. As a result, this condominium building has experienced a history of water infiltration and associated damage along the weep holes in the brick veneer at the west side of the building. To eliminate water infiltration at the base of the brick veneer the weep holes had been sealed with a combination of both sealant and/or coating material on all floors of the building (ref. photographs 40-43).

7. As with many reinforced concrete structures located in the harsh environmental conditions along the Gulf of Mexico there was clear evidence of a history of corrosion and related distress in both the pre-cast, pre-stressed hollow core concrete panels and in the reinforced CMU walls supporting those hollow core concrete panels. There was also evidence of a history of prior repairs to the cracking and related distress in both the hollow core concrete panels and the CMU walls, especially along the east side of the building, with direct exposure to the Gulf of Mexico.

8. There was also clear evidence of ongoing corrosion in the cable reinforcement in the pre-cast concrete hollow core panels as well as in the steel reinforcement of the CMU walls primarily along east face of the building.

9. The historical and ongoing distress in both the pre-cast hollow core concrete panels and the CMU walls is the result of corrosion due to the harsh environmental conditions along the Gulf of Mexico. This distress is not related to the recent passing of Hurricane Harvey.

10. The ongoing corrosion in both the pre-stress cables in the hollow core concrete panels and in the CMU walls is not attributable to the high wind or blowing rain associated Hurricane Harvey.

    This preliminary report presents my findings and conclusions for the above referenced investigation. This report is provided for your sole use in understanding the cause and extent of the damage to this condominium building. Moody Engineering Inc., and its employees, disclaim any contractual relationship with any other party other than the addressee on this report. The findings and conclusions described in this report are based upon a reasonable degree of engineering probability. Should any additional information become available I reserve the right to review that information and, if necessary, revise this report.

Mr. Richard Kasson
Page 6 of 6


Thank you for the opportunity to assist with the forensic engineering investigation of this
condominium building. Should you have any questions pertaining to the content of this
report please do not hesitate to contact my office.

Sincerely

Eric D. Moody, Ph.D., P.E.
Senior Engineer


Attachments:   Photographs
               National Weather Service Data for Hurricane Harvey

xc: file



Photograph 2: South side of building (typical)



Photograph 3: North side of building (typical)

Photograph 1: West elevation (typical)



Photograph 6:  South side of building (typical)



Photograph 7:  West side of building (typical)



Photograph 4:  East side of building (typical)

Photograph 5:  North side of building (typical)



Photograph 10:  View of aged and deteriorated mod-bit roofing (typical)



Photograph 11:  View of aged and deteriorated mod-bit roofing (typical)



Photograph 8:  View of aged and deteriorated mod-bit roofing (typical)

Photograph 9:  View of aged and deteriorated mod-bit roofing (typical)



Photograph 14:  Cell phone installation and scaffolding around elevator shaft (typical)



Photograph 15: View of existing repairs to aged mod-bit roofing (typical)



Photograph 12:  View of aged and deteriorated mod-bit roofing (typical)

Photograph 13:  View of aged and deteriorated mod-bit roofing (typical)



Photograph 18: Severe granule loss on surface of aged mod-bit cap sheet (typical)



Photograph 19: Close up view of severe granule loss on aged surface of mod-bit cap sheet (typical)



Photograph 16: Severe granule loss on surface of aged mod-bit cap sheet (typical)

Photograph 17: Close up view of severe granule loss on aged surface of mod-bit cap sheet (typical)



Photograph 22:  Isolated gouge in surface of aged and deteriorated mod-bit roofing (typical)



Photograph 23:  Close up view of isolated gouge in surface of aged and deteriorated mod-bit roofing (typical)



Photograph 20:  Severe granule loss on surface of mod-bit cap sheet (typical)

Photograph 21:  Close up view of severe granule loss on surface of mod-bit cap sheet (typical)



Photograph 26: Sealant repair around seam in base flashing (typical)



Photograph 27: Sealant repair around seam in base flashing (typical)



Photograph 24: Existing sealant repair around flashing for plumbing vent (typical)

Photograph 25: Existing sealant repair around flashing for plumbing vent (typical)



Photograph 30:  View of seam in mod-bit cap sheet (typical)



Photograph 31:  Undulation in aged and deteriorated mod-bit cap sheet (typical)



Photograph 28:  Sealant repair along seam in mod-bit cap sheet (typical)

Photograph 29:  Close up view of sealant repair along seam in mod-bit cap sheet (typical)



Photograph 34:  Repairs to mod-bit cap sheet around plumbing vent (typical)



Photograph 35:  Repairs to mod-bit cap sheet (typical)



Photograph 32:  Poorly drained area and repairs to mod-bit cap sheet (typical)

Photograph 33:  Poorly drained area and repairs to mod-bit cap sheet (typical)



Photograph 38:   Wiring supporting cell phone installation (typical)



Photograph 39:   Ballast supporting cell phone tower (typical)



Photograph 36:   Sealant application along seams in metal coping cap on parapet wall (typical)

Photograph 37:   Sealant application along seams in metal coping cap on parapet wall (typical)



Photograph 42:  Close up view of sealant installed in weep holes in west side of building (typical)



Photograph 43:  Close up view of sealant installed in weep holes in west side of building (typical)



Photograph 40: Sealant installed to block weep holes at west side of building (typical)

Photograph 41:  Sealant and coating application installed to block weep holes at west side of building (typical)



Photograph 46:  Rust on metal paneling at elevator shaft (typical)



Photograph 47:  View of CMU wall at elevator shaft (typical)



Photograph 44:  View of balconies at east side of building (typical)

Photograph 45:  View of balconies at east side of building (typical)



Photograph 50:  Isolated spalling at railing connection to hollow core concrete panel (typical)



Photograph 51:  Close up view of isolated spalling at railing connection to hollow core concrete panel (typical)



Photograph 48:  Isolated corrosion in hollow core concrete panel (typical)

Photograph 49:  Rust staining near connections between railing and hollow core concrete panel (typical)



Photograph 54: Concrete spalling in areas of prior repair to hollow core concrete panel (typical)



Photograph 55: Isolated cracking along direction of pre-stress cable in hollow core concrete panel (typical)



Photograph 52: Rust accumulation on exposed pre-stress cable in hollow core concrete panel (typical)

Photograph 53: Close up view of rust accumulation on exposed pre-stress cable in hollow core concrete panel (typical)



Photograph 58:  Existing repair to exposed surface of hollow core concrete panel at unit 1101 (typical)



Photograph 59:  Existing repair to concrete surface of post tensioned hollow core concrete panel (typical)



Photograph 56:  Existing repair to exposed surface of hollow core concrete panel at room 1101 (typical)

Photograph 57:  Close up view of existing repair to exposed surface of hollow core concrete panel at unit 1101 (typical)



Photograph 62: Spalled concrete and corroded pre-stress cable in hollow core concrete panel at unit 401 (typical)



Photograph 63: Close up view of spalled concrete and corroded pre-stress cable in hollow core concrete panel at unit 401 (typical)



Photograph 60: Isolated spall on surface of hollow core concrete panel at unit 501 (typical)

Photograph 61: Close up view of isolated spall on surface of hollow core concrete panel at unit 501 (typical)



Photograph 66:  Area of previously repaired crack in CMU wall (typical)



Photograph 67:  Isolated hairline crack in CMU wall (typical)

Photograph 64:  Isolated crack along previously repaired area of CMU wall (typical)

Photograph 65:  Isolated crack along previously repaired area of CMU wall (typical)



Photograph 70:  Hairline crack in area of previously repaired CMU wall at unit 1101 (typical)



Photograph 71:  Area of prior repair to CMU wall at unit 1402 (typical)



Photograph 68:  Area of prior repair in CMU wall at unit 401 (typical)

Photograph 69:  Hairline crack in area of previously repaired CMU wall at unit 201 (typical)



Photograph 74: Isolated crack in previously repaired CMU wall at unit 1101 (typical)



Photograph 75: Close up view of previously repaired isolated crack in CMU wall at unit 1101 (typical)



Photograph 72: Hairline crack in previously repaired CMU wall at unit 1103 (typical)

Photograph 73: Prior repair to crack in CMU wall at unit 1404 (typical)



Photograph 78:  Spalling in CMU wall at unit 401 (typical)



Photograph 79:  Spalling in CMU wall at unit 501 (typical)



Photograph 76:  Hairline crack in area of prior repair in CMU wall at unit 1103 (typical)

Photograph 77:  Close up view of hairline crack in area of prior repair in CMU wall at unit 1103 (typical)

## Storm Events Database

### Search Results for Nueces County, Texas

**All Available Event Types**

Due to changes in the methods used by the NWS to spatially locate Waterspouts, please query by state (FL, TX, VA, etc) for Jan 1996 through Sep 2001. Beginning October 2001, please query by Marine Zone (N. Atlantic, S Atlantic, Gulf of Mexico, S Pacific, N. Pacific, Alaskan Waters, Hawaiian Waters, Great Lakes, etc) using the drop-down box for "State/Area".

**Nueces county contains the following zones:**
'Nueces'

2 events were reported between 08/01/2017 and 08/31/2017 (31 days)

**Summary Info:**

| | |
|---|---|
| Number of County/Zone areas affected: | 1 |
| Number of Days with Event: | 1 |
| Number of Days with Event and Death: | 0 |
| Number of Days with Event and Death or Injury: | 0 |
| Number of Days with Event and Property Damage: | 1 |
| Number of Days with Event and Crop Damage: | 0 |
| Number of Event Types reported: | 2 |

**Column Definitions:**
'Mag': Magnitude, 'Dth': Deaths, 'Inj': Injuries, 'PrD': Property Damage, 'CrD': Crop Damage

*Click on Location below to display details.*
*Available Event Types have changed over time. Please refer to the Database Details for more information.*

Select: [ All Hail ▼ ]  [ All Tornadoes ▼ ]  [ All Wind Speeds ▼ ]          Sort By: [ Date/Time (Oldest) ▼ ]

| Location | County/Zone | St. | Date | Time | T.Z. | Type | Mag | Dth | Inj | PrD | CrD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Totals:** | | | | | | | | 0 | 0 | 1.300B | 0.00K |
| NUECES (ZONE) | NUECES (ZONE) | TX | 08/25/2017 | 15:00 | CST-6 | Storm Surge/tide | | 0 | 0 | 300.000M | 0.00K |
| NUECES (ZONE) | NUECES (ZONE) | TX | 08/25/2017 | 17:00 | CST-6 | Hurricane | | 0 | 0 | 1.000B | 0.00K |
| **Totals:** | | | | | | | | 0 | 0 | 1.300B | 0.00K |

# Storm Events Database

**Event Details:**

| Event | Hurricane |
|---|---|
| -- Category | **4** |
| State | **TEXAS** |
| County/Area | **NUECES** |
| WFO | **CRP** |
| Report Source | **NWS Storm Survey** |
| NCEI Data Source | **CSV** |
| Begin Date | **2017-08-25 17:00 CST-6** |
| End Date | **2017-08-26 12:00 CST-6** |
| Deaths Direct/Indirect | 0/0 (fatality details below, when available...) |
| Injuries Direct/Indirect | 0/0 |
| Property Damage | **1.00B** |
| Crop Damage | **0.00K** |
| Episode Narrative | Major Hurricane Harvey impacted the Middle Texas coast on August 25th and 26th. Harvey was the first category 4 hurricane to strike Texas since Hurricane Carla in 1961. Harvey severely affected the cities of Rockport, Fulton, Port Aransas, Aransas Pass, Ingleside, Holiday Beach, and Refugio. Minor to moderate damage occurred in cities of Portland, Corpus Christi, Seadrift, Woodsboro, Port Lavaca, Goliad, and Victoria. |
| | Harvey weakened to a tropical wave as the system moved across the Caribbean Sea and the Yucatan peninsula from August 18th until the 22nd. Harvey formed into a tropical depression over the southern Gulf of Mexico on the morning of August 23rd. Harvey rapidly intensified from a tropical depression to a major hurricane in 40 hours as it moved northwest toward the Texas coast. Harvey continued to intensify as it approached the Middle Texas coast on August 25th and made landfall as a Category 4 hurricane during the evening hours. Harvey was the first major hurricane to make landfall on the Middle Texas coast since Hurricane Celia in August of 1970. |
| | Hurricane Harvey slowed down after landfall and weakened into a tropical storm on the afternoon of the 26th. Tropical Storm Harvey became nearly stationary west of Cuero from the evening of the 26th through the morning of the 27th. Harvey drifted southeastward across the Victoria Crossroads on the afternoon of the 27th. Harvey then moved into Matagorda Bay during the morning hours of the 28th and back into northwest Gulf of Mexico later that afternoon. Tropical storm conditions persisted near the northern portion of the Middle Texas coast into the early morning hours of the 29th. |
| | Hurricane Harvey moved inland in Aransas County on San Jose Island around 830 PM CDT August 25th. Harvey had a minimum central pressure of 938 millibars and produced a maximum storm surge of 12.5 feet. Maximum sustained winds were estimated at 130 mph (115 knots) with gusts to 160 mph (140 knots). In South Texas, the maximum recorded rainfall from Hurricane Harvey was 17.08 inches 4 miles northwest of Victoria. Radar estimates were close to 20 inches over eastern portions of Refugio County. The height of the storm tide, referenced to mean higher high water, ranged from 3 to 5 feet on northern Padre Island and around Port O'Connor to a maximum of 12.5 feet in northeast Aransas County in the Aransas National Wildlife Refuge near San Antonio Bay. Storm tide levels in the interior bays were generally from 5 to 8 feet with higher amounts near 10 feet on the south end of Copano Bay, the north end of Aransas Bay, and the north end of Lavaca Bay. |
| | There were no direct fatalities from Hurricane Harvey on the Middle Texas Coast. There were 2 indirect fatalities in Rockport and 1 near Bloomington. All of the associated affects from Hurricane Harvey in South Texas from August 25th to August 27th resulted in 14 injuries, $4.5 billion in property damage, and around $65 million in crop damage. Specifically in South Texas, Harvey's inland flooding resulted in $5 million in property damage. One tornado near Seadrift resulted in $10 thousand in property damage. The powerful winds resulted in 14 injuries, $4 billion in property damage, and $65 million in crop damage. The storm tide resulted in $530 million in property damage and a number of drowned livestock. Damage estimates to public property and infrastructure was $130 million in South Texas. Hurricane Harvey blew down or damaged around 550 power transmission structures. American Electric Power (AEP) repaired or replaced around 5000 distribution poles that were blown down or damaged by Harvey. Almost four million total feet of transmission and distribution conductor were replaced, approximately 712 miles. Power was restored to |

around 200,000 customers within 2 weeks.

In Aransas County, widespread major damage occurred across the county with a few areas having catastrophic damage. Catastrophic damage was located across Copano Village, Holiday Beach, and Lamar with many homes, some elevated, with second stories completely collapsed. Nearly every structure was greatly impacted. A couple of brick homes were destroyed near Copano Village. Catastrophic damage occurred to homes in the Copano Ridge area. Nearly all the trees in the Holiday Beach, Lamar, and Goose Island State Park area were without leaves with many trees snapped or uprooted. Most of Rockport and Fulton experienced widespread major structural damage. Several homes in the Key Allegro subdivision collapsed. Exterior walls collapsed on the high school gymnasium, on several churches, and on several new hotels. Upper floors of several apartment buildings were removed. Mobile homes and recreational vehicles were demolished. Billboard signs were blown down. Numerous power poles were blown down or snapped. Six hangars were demolished at the Aransas County Airport along with many airplanes. The county remained without power for 2 to 3 weeks. A mesonet wind sensor at Aransas County Airport recorded sustained winds around 110 mph with a peak gust to 150 mph. Nearly 1500 homes were destroyed, almost 3800 homes suffered major damage, and 5350 homes suffered minor damage. There were 175 businesses with major damage. Storm surge greatly impacted Holiday Beach and Copano Village. The surge punched holes through walls and garage doors on the lower portions of most homes. The surge floated vehicles, recreational vehicles, and boats well inland. The surge approached and flowed across Egery Island Road and Farm to Market 136 in several locations south of Bayside in extreme western Aransas County. Numerous cattle were killed north of Holiday Beach. A large portion of Rattlesnake Point Road was eroded and washed away heading out to Redfish Lodge on Copano Bay. The pier south of the lodge was completely washed away. Storm surge of 4 to 5 feet was common across the county. The maximum storm surge of 12.5 feet occurred in the Aransas National Wildlife Refuge. There were 356 homes that received major damage from storm surge and there were 1126 homes that received minor damage from storm surge. There were 1200 homes that were affected by storm surge. From NOAA photos, there were 14 cuts formed on the southern end of San Jose Island.

In Nueces County, the most significant damage was in Port Aransas where widespread major damage occurred. There were 4170 homes that received major damage and 1036 homes destroyed. Most homes suffered major roof damage while some homes lost roofs and walls collapsed. There were 457 businesses with major damage and slightly more than 1100 homes with minor damage. Mobile homes and recreational vehicles were demolished. Numerous power poles were blown down or snapped. The roofs were damaged at the elementary, middle, and high schools for Port Aransas leading to water damage in the interior. In Corpus Christi, widespread minor property damage was common due to lost shingles and fences down. Some residences and businesses experienced moderate damage mainly across the northern part of the city. Taller buildings downtown suffered more significant damage and lost signs. A few highway signs were blown down. Minor roof damage was common to residences and business in North Padre Island with some areas with moderate damage. Peak wind gusts measured were around 130 mph in Port Aransas. Storm tides were from 6 to 8 feet in Port Aransas as the storm surge entered from the west from Corpus Christi and Redfish Bays. Numerous boats were damaged or destroyed and pushed out of their moorings onto high ground. A large drill boat broke loose, destroyed a pier, and became grounded along the jetty. Two tugs broke loose near the Gulf Intracoastal Waterway with one becoming grounded and the other sinking. Two ferries were damaged when they were pinned again the loading dock. The storm surge inundated Highway 361 along a 10 miles stretch from near the Mustang Island State Park to Port Aransas with the water several feet deep. A few boats became moored near Packery Channel. The Arnold Palmer designed golf course at Palmilla Beach south of Port Aransas was inundated by storm surge with water covering most of the course. Storm tide of 4 to 6 feet impacted residences and businesses in Padre Island from the Laguna Madre. Storm surge caused major damage to 520 homes and minor damage to 1327 homes. Storm surge affected an additional 2200 homes. The Port of Corpus Christi was shutdown for a record 6 days. Port Aransas Independent School District lost 8 buses due to damage from salt water.

In Calhoun County, minor to moderate property damage was common across the city of Port Lavaca with large areas of siding removed from a few well constructed homes. The tops of grain bins in Port Lavaca were peeled off. Numerous trees were blown down in the community of Seadrift. Many homes experienced minor to moderate roof and property damage. Some poorly constructed homes experienced major roof damage. In Port O'Connor, numerous trees were blown down with three quarters of the community experiencing minor roof damage. A few power poles were blown down. Minor to moderate roof damage occurred at Magnolia Beach, Alamo Beach, and Indianola. Over 2100 homes and 72 businesses received major damage while 421 homes were destroyed. There were 1865 homes with minor damage and 1575 homes affected. There was significant damage to the cotton crop in the county. Hundreds of acres unharvested cotton were ruined in the fields. Harvested cotton in modules and bales were damaged by the wind or blown into water filled ditches. The highest wind speed measured was 82 mph with gusts to 110 mph northwest of Seadrift. Storm tides averaged from 6 to 8 feet across Calhoun County with maximum tide levels around 10 feet recorded on the north end of Lavaca Bay while lower tides from 3 to 5 feet occurred from Port O'Connor to southeast of Seadrift next to Espiritu Santo Bay. In Port Lavaca, water from Chocolate Bay inundated the public boat ramp near Buren Road. The lower half of Buren Road was inundated. The entire marina along Lavaca Bay was strongly impacted with 16 boats declared a total loss with many of them sinking in the marina. Several boats were grounded next to the marina. The Bayfront Peninsula Park was inundated. Areas east of Broadway street were inundated with water reaching across Highway 35 in the area near Lighthouse Beach. Piers at Lighthouse Beach Park and Bayfront Peninsula Park were destroyed. Nearly the entire marina in Seadrift was inundated from storm surge with several boats grounded on the marina parking lot. Most of the wooden docks at the marina and a few wooden piers were destroyed. The storm surge reached Bay Avenue almost reaching the beachfront pavilion. Storm surge entered homes near the Bay Avenue and Orange Street intersection. In Magnolia Beach and Indianola, storm surge flooded nearly all of Magnolia Public Beach and crossed North Ocean Drive in a few spots. A few areas of South Ocean Drive near Indianola were inundated. Several older wooden docks and piers

were destroyed. In Port O'Connor, storm surge from Matagorda Bay reached half of the way up Kingfisher Beach toward Park Street. The storm surge caused major damage to 56 homes, minor damage to 322 homes, and affected 446 homes across the county. A thousand foot cut was made through Matagorda Island.

In San Patricio County, the worst damage was confined to the eastern half of the county. Almost 8700 homes were affected by the hurricane. There were 155 homes destroyed, 425 homes with major damage, and slightly more than 3300 homes with minor damage. There were 72 businesses with major damage. The hardest hit areas were Aransas Pass and Ingleside where major damage occurred. Widespread roof damage and tree damage occurred in this area. Numerous large power poles were blown down across the eastern half of the county. The water tower in Aransas Pass was destroyed. Roof damage led to extensive interior damage to the Care Regional Medical Center in Aransas Pass. Power outage was widespread with some areas without power for over a week. There was widespread minor roof damage and fences blown down in Portland along with a few trees blown down. Minor roof damage occurred in Taft and a car wash was destroyed. A couple of grain silos at the Midway Gin near Taft were toppled over. Crop damage to cotton stored in modules occurred in the eastern part of the county. The peak wind recorded was in Aransas Pass with sustained wind speed of 100 mph with gusts to 135 mph at Conn Brown Harbor. Survey from the United States Geologic Survey (USGS) indicated a storm tide of around 4 feet impacted the area from Ingleside On-the-Bay to Aransas Pass. Numerous wooden piers and docks were damaged or destroyed. A couple of boats were damaged in the Conn Brown Harbor in Aransas Pass. Major flooding was experienced in the low part of Aransas Pass adjacent to the levee. One home suffered major damage from storm surge while 40 homes had minor damage. Around 540 homes were affected by storm surge.

In Refugio County, widespread moderate structural damage with pockets of major structural damage occurred in Refugio. Most homes and businesses had roof damage, broken windows, and damaged garage doors. Two motels received significant damage to their roofs. Gas station canopies and many signs were destroyed. A few brick structures experienced moderate damage. Numerous trees and power poles were blown down. Roof damage occurred to several churches, every school building in the district except for the athletic facility. The school gymnasiums and auditorium lost portion of their roofs. Several trailer homes and storage buildings were destroyed. There was widespread tree damage with a few very large trees completely uprooted. Widespread moderate structural damage occurred in Bayside, Austwell, and Tivoli. Numerous trees and power poles were blown down including some high tension power poles. In Woodsboro, widespread minor to moderate damage occurred with a few poorly constructed homes with major damage. The elementary gymnasium and auditorium roofs were blown off. Numerous trees and a few power poles were blown down. The Bayside Richardson Coop Gin near Woodsboro sustained major damage and 30 thousand bales of cotton in storage modules were damaged. A sensor deployed by Texas Tech measured sustained winds of 106 mph with gusts to 125 mph just west of Mission Bay before the sensor was hit by debris. Another sensor showed wind speed of 102 mph with gusts to 129 mph north of the intersection of Highway 35 and Farm to Market Road 774 in eastern Refugio County. Around 440 homes were destroyed, around 1050 homes experienced major damage, and 66 businesses suffered major damage. Around 750 homes had minor damage with another 310 homes affected. Storm tide varied across the bay areas of the county. The higher storm tides affected the northeast part of the county as the storm surge pushed in from San Antonio Bay. Storm surge reached 10 feet east of Tivoli near the mouth of the Guadalupe River. Storm tides were lower on the west side of Copano Bay with storm surge only reaching 3 to 4 feet. Water covered Farm to Market Road 136 near the Copano Bay Bridge. Only 2 homes were affected by storm surge in the county.

In Goliad County, widespread minor roof damage occurred in the city of Goliad. Numerous trees and a few power poles were blown down across the county. The roof of the old high school gymnasium was peeled off. A hole was punched in the roof of the new wing of the school. Some class rooms along with the weight room and dressing room suffered water damage. Three families were displaced from homes when roofs and walls collapsed. There was some minor structural damage to some homes in Goliad. Several barns were blown down throughout the county. Some livestock were injured.

In Victoria County, Widespread minor to moderate roof damage occurred in the city of Bloomington. Several mobile homes were destroyed. All but three facilities within the Bloomington school district suffered wind and water damage. Widespread minor roof damage occurred in the city of Victoria. Several trees and a few power poles were blown down. Fences and street signs were blown down across the city. The maximum wind gust recorded in Victoria was 85 mph. Hundreds of acres of unharvested cotton were damaged in the field. Harvested cotton in modules and bales were damaged also. A few barns and storage buildings were blown down across the county.

| Event Narrative | The most significant damage was in Port Aransas where widespread major damage occurred. There were 4170 homes that received major damage and 1036 homes destroyed. Most homes suffered major roof damage while some homes lost roofs and walls collapsed. There were 457 businesses with major damage and slightly more than 1100 homes with minor damage. Mobile homes and recreational vehicles were demolished. Numerous power poles were blown down or snapped. The roofs were damaged at the elementary, middle, and high schools for Port Aransas leading to water damage in the interior. In Corpus Christi, widespread minor property damage was common due to lost shingles and fences down. Some residences and businesses experienced moderate damage mainly across the northern part of the city. Taller buildings downtown suffered more significant damage and lost signs. A few highway signs were blown down. Minor roof damage was common to residences and business in North Padre Island with some areas with moderate damage. Peak wind gusts measured were around 130 mph in Port Aransas. |
|---|---|

All events for this episode:

| Location | County/Zone | St. | Date | Time | T.Z. | Type | Mag | Dth | Inj | PrD | CrD |
|---|---|---|---|---|---|---|---|---|---|---|---|

8/9/2018

Storm Events Database - Event Details | National Centers for Environmental Information

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Totals:** | | | | | | | 0 | 14 | 4.559B | 65.000M |
| CALHOUN (ZONE) | CALHOUN (ZONE) | TX | 08/25/2017 | 15:00 | CST-6 | Storm Surge/tide | 0 | 0 | 30.000M | 0.00K |
| ARANSAS (ZONE) | ARANSAS (ZONE) | TX | 08/25/2017 | 15:00 | CST-6 | Storm Surge/tide | 0 | 0 | 200.000M | 0.00K |
| NUECES (ZONE) | NUECES (ZONE) | TX | 08/25/2017 | 15:00 | CST-6 | Storm Surge/tide | 0 | 0 | 300.000M | 0.00K |
| SEADRIFT | CALHOUN CO. | TX | 08/25/2017 | 15:14 | CST-6 | Tornado | EF0 0 | 0 | 10.00K | 0.00K |
| ARANSAS (ZONE) | ARANSAS (ZONE) | TX | 08/25/2017 | 17:00 | CST-6 | Hurricane | 0 | 14 | 1.750B | 0.00K |
| NUECES (ZONE) | NUECES (ZONE) | TX | 08/25/2017 | 17:00 | CST-6 | Hurricane | 0 | 0 | 1.000B | 0.00K |
| JIM WELLS (ZONE) | JIM WELLS (ZONE) | TX | 08/25/2017 | 18:00 | CST-6 | Tropical Storm | 0 | 0 | 1.00K | 0.00K |
| SAN PATRICIO (ZONE) | SAN PATRICIO (ZONE) | TX | 08/25/2017 | 18:00 | CST-6 | Hurricane | 0 | 0 | 500.000M | 5.000M |
| KLEBERG (ZONE) | KLEBERG (ZONE) | TX | 08/25/2017 | 18:00 | CST-6 | Tropical Storm | 0 | 0 | 10.00K | 0.00K |
| SAN PATRICIO (ZONE) | SAN PATRICIO (ZONE) | TX | 08/25/2017 | 18:00 | CST-6 | Storm Surge/tide | 0 | 0 | 2.000M | 0.00K |
| CALHOUN (ZONE) | CALHOUN (ZONE) | TX | 08/25/2017 | 18:00 | CST-6 | Hurricane | 0 | 0 | 250.000M | 20.000M |
| REFUGIO (ZONE) | REFUGIO (ZONE) | TX | 08/25/2017 | 20:00 | CST-6 | Hurricane | 0 | 0 | 500.000M | 20.000M |
| LIVE OAK (ZONE) | LIVE OAK (ZONE) | TX | 08/25/2017 | 21:00 | CST-6 | Tropical Storm | 0 | 0 | 10.00K | 0.00K |
| REFUGIO (ZONE) | REFUGIO (ZONE) | TX | 08/25/2017 | 21:00 | CST-6 | Storm Surge/tide | 0 | 0 | 20.00K | 0.00K |
| GOLIAD (ZONE) | GOLIAD (ZONE) | TX | 08/26/2017 | 00:00 | CST-6 | Hurricane | 0 | 0 | 1.000M | 0.00K |
| VICTORIA (ZONE) | VICTORIA (ZONE) | TX | 08/26/2017 | 00:00 | CST-6 | Hurricane | 0 | 0 | 20.000M | 20.000M |
| BEE (ZONE) | BEE (ZONE) | TX | 08/26/2017 | 00:00 | CST-6 | Hurricane | 0 | 0 | 10.00K | 0.00K |
| AUSTWELL | REFUGIO CO. | TX | 08/26/2017 | 01:00 | CST-6 | Flood | 0 | 0 | 0.00K | 0.00K |
| MISSION VLY | VICTORIA CO. | TX | 08/27/2017 | 18:00 | CST-6 | Flood | 0 | 0 | 5.000M | 0.00K |
| TIVOLI GULF CST ARPT | CALHOUN CO. | TX | 08/30/2017 | 00:00 | CST-6 | Flood | 0 | 0 | 1.000M | 0.00K |
| **Totals:** | | | | | | | 0 | 14 | 4.559B | 65.000M |